## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

THOMAS L. SANDERSON        )
                                    )
             Plaintiff,      )
                                    )
v.                              )    Case No. 4:23-CV-01242-JAR
                                    )
ANDREW BAILEY, et al.,       )
                                    )
             Defendants.    )

## Suggestions in Opposition to Motion for Issuance of Temporary Restraining Order (Doc. 7)

The Supreme Court has recognized that "[s]ex offenders are a serious threat in this Nation." *McKune v. Lile*, 536 U.S. 24, 32 (2002). Unsurprisingly then, the First Amendment does not grant sex offenders a right to give candy to children on Halloween.



Ex. 1 (Sanderson distributing candy to children at home on October 31, 2022).

1

Despite this, Plaintiff Thomas Sanderson brings this lawsuit to strike down a Missouri statute designed to protect children from Halloween-related contact with sex offenders on October 31. The Court should reject Sanderson's request for a temporary restraining order.

## Introduction and Statement of Facts

In 2001, a minor girl, B.C., spent the night at her friend, A.P.'s, house. Ex. 2 at 4. A.P.'s mother and Sanderson lived at the house with A.P. *Id*. B.C. forgot to bring pajamas, and went to A.P.'s closet to borrow clothes. *Id*. at 4–5. When B.C. came out of the closet, Sanderson "was waiting for her." *Id*. at 5. Sanderson told B.C. "that she needed to lay down" and that she "wasn't going to bed." *Id*. When B.C. tried to leave the room, Sanderson again told her to lay down. *Id*. Then B.C. sat down on the bed and Sanderson sat down beside her and started to tell B.C. about problems that Sanderson was having with his girlfriend, A.P.'s mother (hereinafter "Sanderson's Girlfriend"). *Id*. After Sanderson again told B.C. to lay down, he pushed her down on the bed and B.C. became "extremely scared." *Id*. Despite being scared, B.C. told Sanderson to stop. *Id*. Instead of stopping, Sanderson tried to kiss B.C. and then got on top of B.C. and put his hands on B.C.'s thighs underneath B.C.'s t-shirt. *Id*. B.C. could smell alcohol on Sanderson's breath. *Id*.

B.C. again told Sanderson to stop. *Id*. Sanderson told B.C. "no" and then

2

put his hand inside B.C.'s underwear. *Id*. Again, B.C. told Sanderson to stop. *Id*. at 5–6. Rather than stop, Sanderson smiled at B.C., and put his fingers inside B.C.'s vagina. *Id*. at 6. Eventually, Sanderson removed his fingers. *Id*.

B.C. later reported Sanderson's conduct to the police. When the police interviewed Sanderson, he "turned beet red. His lower lip started quivering. He started a gentle sob, [and] looked down . . . ." *Id*. at 7. Sanderson wrote "a letter of apology" where, among other things, he said that he "'apologized if he offended or hurt anyone in any way' and explained that his 'alcoholism turns him into a person he is not . . . .'" *Id*. (alterations omitted). Sanderson's statement also indicated that there "was a good chance that [the allegations] may have happ[en]ed." *Id*.

At trial, the jury convicted Sanderson, and he was sentenced to two years of imprisonment. The Missouri Court of Appeals affirmed his conviction. *Id*. at 12.

On October 31, 2022, the Hazelwood police department received many tips that a registered sex offender was decorating a residence and distributing candy to children. Ex. 3 at 1. As a result, the Hazelwood Police Department investigated Sanderson for potentially violating Missouri Revised Statute § 589.426. *Id*. During the investigation, officers videotaped Sanderson's residence and its many Halloween decorations at approximately 3:30 p.m. on

Halloween. *Id.* at 2. Officers returned at 5:00 p.m. and videotaped children coming to Sanderson's residence, and even videotaped Sanderson distributing candy to children. *Id.* at 2–3. Below are still images from the officer's videotaped surveillance:



Ex.4.



Ex. 5.

Having documented Sanderson's violation of Missouri law, officers

approached the residence to make contact with Sanderson. Ex. 3 at 3; Ex. 12. Sanderson's Girlfriend indicated that Sanderson was no longer at the residence, and officers informed Sanderson's Girlfriend of § 589.426's provisions,[1] warned that Sanderson must return to compliance with Missouri law, and indicated that they would return later that night to verify whether Sanderson had taken steps to comply. *Id.* at 3–4; Ex. 12. Lt. Burger covered each of the requirements of Missouri's law with Sanderson's Girlfriend. Ex. 12 at 8:01. Lt. Burger specifically mentioned that a sign was required to be posted, and that there was no posted sign. *Id.* Lt. Burger also advised Sanderson's Girlfriend that if Sanderson was outside when officers returned, then Sanderson would face consequences. *Id.* at 4:31; 6:35.

When officers returned later that night at approximately 8:23 p.m., they found that Sanderson had not taken any steps to comply with § 589.426's provisions. Ex. 3 at 9. Instead, Sanderson's residence was still decorated and illuminated, and no sign had been posted. Ex. 3 at 9. Below are still images

---

[1]  RSMo 589.426 states: Halloween, restrictions on conduct — violations, penalty.
1. Any person required to register as a sexual offender under sections 589.400 to 589.425 shall be required on October thirty-first of each year to:
    (1) Avoid all Halloween-related contact with children;
    (2) Remain inside his or her residence between the hours of 5 p.m. and 10:30 p.m. unless required to be elsewhere for just cause, including but not limited to employment or medical emergencies;
    (3) Post a sign at his or her residence stating, "No candy or treats at this residence"; and
    (4) Leave all outside residential lighting off during the evening hours after 5 p.m.
2. Any person required to register as a sexual offender under sections 589.400 to 589.425 who violates the provisions of subsection 1 of this section shall be guilty of a class A misdemeanor.

5

from the officer's body-worn cameras:



Ex. 6.



Ex. 7.

Officers once again made contact with Sanderson's Girlfriend, who

6

continued to insist that Sanderson was not present. Ex. 2 at 11. Before long, however, Sanderson appeared from inside the display, and was antagonistic with the officers. *Id.*; *See, e.g.,* Ex. 14 at 7:19. Among other things, Sanderson told the officers he was a convicted sex offender because of "[t]hat sixteen year old bitch girl, little girlfriend of my daughters, that made some allegation" before telling officers "go away, go away, bye bye, get a warrant and come back fucker." *Id.* at 12; Ex. 13 at 5:55–6:06.

Officers were able to convince some of the adults present to turn off the exterior lighting—as required by § 589.426—and then officers left. *Id.* at 12. Officers noted that there was no sign indicating that there were no treats or candy at this residence. *Id.* at 12–13. Later, Sanderson was charged with violating § 589.426. *State v. Sanderson*, 22SL-CR07753. Sanderson, while represented by counsel, pleaded guilty on April 13, 2023. Ex. 8.

### Standard for Temporary Restraining Order

In considering whether to grant a temporary restraining order or preliminary injunction, the Court employs the four-factor *Dataphase* test analyzing: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Home Instead, Inc. v. Florance*, 721

F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)); *accord Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 914 (8th Cir. 2015) (stating the *Dataphase* factors apply to the Court's consideration of a temporary restraining order). While no factor is independently dispositive, "the probability of success factor is the most significant[.]" *Home Instead*, 721 F.3d at 497. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). And, the party seeking the preliminary injunction bears the burden of demonstrating the necessity of the preliminary injunction. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009).

The United States Court of Appeals for the Eighth Circuit has reiterated, "a more rigorous standard" applies to challenges to state statutes. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). A party seeking injunctive relief in the implementation of a State's statute "must demonstrate more than just a 'fair chance' that it will succeed on the merits." *Id.* at 731–32. The Eighth Circuit has "characterize[d] this more rigorous standard, drawn from the traditional test's requirement for showing a likelihood of success on the merits, as requiring a showing that the movant 'is likely to prevail on the merits.'" *Id.* at 732 (quoting *Doran v. Salem Inn, Inc.*,

422 U.S. 922, 931 (1975)). This more rigorous standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)). And even if the party seeking the injunctive relief makes a showing that it is likely to prevail on the merits, the Court must still consider the remaining *Dataphase* factors. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) ("As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits.").

Further, a plaintiff seeking a preliminary injunction "must generally show reasonable diligence." *Id.* at 1944. Thus, a party's delay in seeking injunctive relief can, in itself, provide a basis for the Court to deny a motion requesting such relief.

## Analysis

## I.   Sanderson has unreasonably delayed in bringing this suit; the equities do not weigh in his favor.

Since Sanderson has unreasonably delayed in bringing this case, the Court should refuse to grant a temporary restraining order. Sanderson had ample opportunity to raise a First Amendment challenge to § 589.426 at any point after Missouri prosecuted Sanderson for violating the statute to which

9

he pled guilty on April 13, 2023. *State v. Sanderson*, 22SL-CR07753 (St. Louis Cnty. Cir. Ct.); Ex. 8. Though a defendant is always within his rights to raise or not raise any defense in a criminal prosecution, Sanderson's failure to request injunctive relief until two weeks before Halloween weighs against him significantly in this action.

His guilty plea was more than six months ago. But rather than act with reasonable diligence by bringing this challenge in April, May, June, July, August, or September, Sanderson filed his lawsuit on October 3, 2023, less than thirty days before Halloween. [Doc. 1]. Moreover, Sanderson did not seek a temporary restraining order until October 11, 2023, a week after filing suit. Doc. 7.

Sanderson's decision to hold his claim and request for a restraining order in reserve until twenty days and two weeks before Halloween, respectively, is an unreasonable delay which constitutes independent and adequate reason to deny his request for a temporary restraining order.

Though there is not a strict definition of a period of time which constitutes unreasonable delay, courts have found similar delays to be unreasonable, the United States Court of Appeals for the Eighth Circuit has found that a plaintiff that waited a year to bring a claim could not demonstrate irreparable injury because of their unreasonable delay. *Wildhawk Inv., LLC v.*

*Brava I.P., LLC*, 27 F.4th 587, 597 (8th Cir. 2022) (citing *Benisek*, 138 S. Ct. at 1944). The same is true when the plaintiff delayed seven months. *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 936 (8th Cir. 2002). In an opinion from this summer, Judge Fleissig recognized that this Court has denied motions for preliminary injunctions where there was a delay of seven months. *Facility Guidelines Inst., Inc. v. UpCodes, Inc*., No. 4:22-CV-01308 AGF, 2023 WL 4026185, at *14 (E.D. Mo. June 15, 2023) (citing *Grasso Enters., LLC v. Express Scripts, Inc*., No. 4:14-CV-1932 HEA, 2015 WL 10781579, at *3–5 (E.D. Mo. Mar. 4, 2015)).

Although there is no bright-line test, Sanderson's delay is also indicative of the lack of irreparable harm under the facts of this case. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."). Sanderson waited months to bring his claim, and now he has requested a statewide injunction prohibiting the enforcement of Missouri's criminal code. This Court should not reward this inequitable and inexcusable delay with a statewide injunctive relief.

## II.     Sanderson cannot demonstrate a substantial likelihood of success on the merits.

11

Sanderson, amongst other things, must show that he "is likely to prevail on the merits" of his compelled speech challenge to enjoin the enforcement of § 589.426.1(3), which is a Missouri statute lawfully passed by the People's democratically elected representatives. *Rounds*, 530 F.3d at 732 (quoting *Doran*, 422 U.S. 931). For the following reasons, Sanderson's belated request for a temporary restraining order falls well short of that high bar.

### A. Missouri's sign-posting requirement is not compelled speech: it is required for an orderly society and not related to a particular political or ideological message.

In *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995), the Eighth Circuit observed that the "compelled speech" doctrine "has been found only in the context of governmental compulsion to disseminate a particular political or ideological message." The Eighth Circuit continued, "There is no right to refrain from speaking when 'essential operations of government may require it for the preservation of an orderly society . . . .' " *Id.* at 878. Following *Sindel*, the Fifth Circuit reaffirmed that holding and applied it to the case where a sex offender alleged that sex offender registry requirements were compelled speech. *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014). The Fifth Circuit rejected Sanderson's argument in the registration context, holding, "When the government, to protect the public, requires sex offenders to register their residence, it conducts an "essential operation of the government . . . ." *Id.*

12

(alterations omitted).

Here, Missouri's sign-posting requirement is not compelled speech because "essential operations of government may require it for the preservation of an orderly society[.]" *Sindel*, 53 F.3d at 878. As the Fifth Circuit found when considering a compelled speech challenge to SORNA's registration requirements, *Arnold*, 740 F.3d at 1035, Missouri's sign-posting requirement does not violate the First Amendment's prohibition against compelled speech because it is not compelled speech.

### B. Missouri's sign-posting requirement is not compelled speech, it is speech incidental to conduct, and therefore does not run afoul of the First Amendment.

The First Amendment "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 567 (2011). That is, when a statute is designed to regulate conduct and that conduct "was in part initiated, evidenced, or carried out by means of language" then the impact on speech is incidental, and not a violation of the First Amendment. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,* 547 U.S. 47, 62 (2006) (quoting *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949)). In *Rumsfeld*, the Court remarked that Congress can prohibit employers from discriminating on the basis of race, and therefore, Congress can prohibit employers from displaying a sign that

13

reads "White Applicants Only." *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 389 (1992)).

Those rationales apply to Sanderson's challenge in this case. Although Sanderson has only challenged § 589.426's sign-posting requirement, the entire criminal statute is targeted at proscribing sex-offender conduct on Halloween. The statute prohibits "Halloween-related contact with children." § 589.426.1(1). To prevent contact with children, the statute *also* prohibits activities that would encourage children to approach a sex offender's residence. These prohibitions include allowing sex offenders to be outside their residence between 5 and 10:30 p.m., and requiring all outside residential lighting to be turned off after 5:00 p.m. *Id.* at (2), (4). In order to further effectuate the statute's regulation of sex offender conduct, it also requires sex offenders to post a sign indicating there are "no treats or candy at this residence" on Halloween. *Id.* at (3). The purpose of the sign-posting requirement is an incidental requirement, whose clear purpose is to prohibit "Halloween-related contact" between sex offenders and children. In this way, the statue is governing conduct with only incidental impact on speech.

**C.   Even if Missouri's sign-posting requirement is "compelled speech" it is narrowly tailored to achieve a compelling**

14

**government interest: protecting children from sex offenders.**

Even if this Court were to apply a strict-scrutiny analysis to the statute in question,[2] Sanderson cannot demonstrate a likelihood of success on the merits of his claim. Under the Court's prior strict-scrutiny precedent, the First Amendment prohibits state action that restricts free expression and state action that compels an individual to express a specific point of view. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The prohibition against compelled speech applies whether the compelled statement is one of fact or of opinion. *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988). If a state's action results in a content-based restriction, then the action must be subjected to strict scrutiny, which requires the State to "show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Burson v. Freeman*, 504 U.S. 191, 198 (1992). "Despite the ritualistic ease with which" the Supreme Court may "state this now-familiar standard, its announcement does not allow [this Court] to avoid the truly difficult issues involving the First Amendment." *Id.*

Here, Sanderson concedes that "there is no doubt that protecting children is a compelling [State] interest." Doc 7-1 at 17. While that concession

---

[2] We do not necessarily grant that strict scrutiny analysis is appropriate here, but have briefed it here to address the arguments most favorable to Sanderson.

is undoubtedly true, this is not the only State interest at issue here. Sanderson's claim also presents unique concerns central to our federalist system of government, which recognizes the traditional power of the several states to regulate societal norms through societal opprobrium attached to criminal law. As the Court has recognized, "Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power of a State to pass laws means little if the State cannot enforce them." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). As these State interests are beyond question, under the Supreme Court's strict-scrutiny test, the only question remaining for this Court is whether § 589.426.1(3) "is narrowly drawn to achieve" the State's end in the compelling interest. *Burson*, 504 U.S. at 198.

Section 589.426.1(3) is only one component of a broader statutory scheme, which is calculated to further the State's interest in protecting children and other vulnerable victims from the recidivist predations of sexual offenders. *See* Mo. Rev. Stat. § 589.400. While this statutory regime was enacted, at least partially, in response to federal funding requirements, Missouri enacted its Sex Offender Registration Requirements in its sovereign prerogative to assist state and local law enforcement and the general public in identifying and locating sexual offenders. *See* Mo. Rev. Stat. § 589.400–§

16

589.426. That statutory regime includes a mechanism by which offenders are categorized by tier and then obligated to adhere to registration conditions. § 589.400; § 589.404; § 589.407; § 589.414; § 589.425. The law establishes a felony criminal offense for an offender's failure to register in accordance with statutory provisions and a misdemeanor criminal offense for an offender's failure to adhere to the specific provisions of § 589.426.1. This broader statutory scheme allows for sexual offenders to petition to be removed from the sexual offender registry and to therefore no longer be subject to, among other things, the Halloween-related restrictions contained in § 589.426.1. *See* § 589.426.2; *see also* § 589.401.17.

This statutory scheme, as well as the factual requirements of the Missouri Statute, distinguishes this case from *McClendon v. Long*, 22 F.4th 1330 (11th Cir. 2022), relied upon by Sanderson. In *McClendon*, the county sheriff placed signs in the front yards of the fifty-seven sexual offenders residing within his county. 22 F.4th at 1332. These signs included stop signs, a trick-or-treat candy bag with a line through it, and stated, "NO TRICK-OR-TREAT AT THIS ADDRESS!!" *Id.* at 1333. The sign further stated that it was "A COMMUNITY SAFETY MESSAGE FROM BUTTS COUNTY SHERIFF GARY LONG" *Id.* Sheriff Long made a statement on his Facebook page declaring, in pertinent part, that "Georgia law forbids registered sex offenders

17

from participating in Halloween, to include decorations on their property." *Id.*
But as the *McClendon* Court noted, it was "now undisputed, however, that
Georgia law does not forbid registered sex offenders from participating in
Halloween." *Id.* Instead, the record indicated that the Sheriff had begun the ad
hoc regime in years prior by giving sex offenders fliers and asking them to place
the flier on their door. *Id.* at 1335.

Here, Missouri law, unlike Georgia law as explained in *McClendon*, does
explicitly prohibit Missouri's registered sex offenders from engaging in
Halloween activities. § 589.426.1. These restrictions require Sanderson, and
other offenders like him, to "[a]void all Halloween-related conduct with
children," *Id.* at (1), remain inside his residence between 5 p.m. and 10:30 p.m.,
*Id.* at (2), post a sign as his residence stating "No candy or treats at this
residence," *Id.* at (3), and leave off all of his outside residential lighting after 5
p.m. *Id.* at (4). These restrictions are time-limited to October 31st of each year.
§ 589.426.1.

Further, Missouri's law functions differently than Georgia's law at issue
in *McClendon*. As the *McClendon* court discussed in finding the county sheriff's
actions were not narrowly tailored, Georgia's sexual offender registration law
required Georgia to classify sexual offenders based on the recidivism risk posed
by each sexual offender. 22 F.4th at 1333. None of the plaintiffs in *McClendon*

18

were "classified as posing an increased risk of recidivism." *Id.* In reversing the district court, the *McClendon* court stated, "The Sheriff has not provided any record evidence that the registrants in Butts County actually pose a danger to trick-or-treating children or that these signs would serve to prevent such danger." *Id.* at 1338. This finding appeared to be at least partially predicated on the county sheriff's explanation, "that during his six-year tenure as Sheriff, there were no issues with any registered sex offenders in Butts County having unauthorized contact or reoffending with minors at any time." *Id.* at 1335.

Here, however, the State, even at this early stage, has presented evidence that Sanderson has had unauthorized contact with children. This evidence includes the photograph included on the first page of this response and body camera footage captured on a previous October 31, in which an apparently intoxicated Sanderson (who was located inside his Halloween display which was attracting neighborhood children) yelled at police officers that he was only on the registry because of that "[t]hat sixteen year old bitch girl, little girlfriend of my daughters, that made some allegation." Ex. 14 at 13:42; Ex. 3 at 12; Ex. 13 at 5:55–6:06.

And even without that evidence, Missouri's law does not require a state board to classify offenders and instead classifies offenders into tiers by the offense (or comparative offense in the case of a conviction from another

19

jurisdiction) for which the sexual offender was adjudicated. *See* § 589.400; *see also* § 589.414. While Missouri imposes different reporting periods for each offender tier, every offender is subject to the Halloween provisions of § 589.426.1. § 589.414.5; § 589.414.6; § 589.414.7 § 589.414.8; § 589.426.1. This broader statutory scheme reflects the State's narrow tailoring in that it applies its Halloween provisions only to offenders subject to registration and only then for the period of time for which the offender is required to register.

Unlike in Missouri, the *McClendon* decision concerned an ad hoc system created by a county sheriff that was not authorized by an act of the state legislature. 22 F.4th at 1334. The act of placing a sign in *McClendon* was not part of a broader statutory mechanism and did not flow from a state legislature's reasoned enactment. *See id.* Here, the State of Missouri enacted § 589.426.1(3) requiring the posting of a sign and limited that obligation both temporally to one day of the year in which there is a holiday—the celebration of which results in a dramatically increased presence of unsupervised or lightly supervised children—and to the offenders who have registration requirements under Missouri's law. § 589.426.1(3). That narrow tailoring serves the State's interest of protecting children and in regulating societal norms through the enforcement of its criminal laws. Moreover, the sign does not even make it clear why the house does not have any candy – there are many reasons a person

20

might post a no-candy sign: he might be ill, unable to get up, out of town, or indisposed to interact with children on Halloween for a variety of reasons. A "no candy" sign posted by each offender will also necessarily differ from one offender to the next, making it even less invasive, less likely to cause suspicion and therefore even more distinguishable from the Sheriff's signs in *McClendon*.

Sanderson appears to argue that § 589.426.1(3) is not narrowly tailored because it could apply to offenders who were convicted for an offense related to an adult victim, and because Sanderson believes signs are ineffectual. This line drawing, however, is far too artificially restrictive. And even if Sanderson could demonstrate the signage required by § 589.426.1(3) was not effective (a conclusion which the State does not concede), narrowly tailoring does not require a statute to be "perfectly tailored" to every precise case. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015). The Supreme Court there noted: "the First Amendment does not confine a State to addressing evils in their most acute form." *Id.* at 454. Here, the State has recognized the existence of compelling interests and has passed § 589.426.1(3) to serve those compelling interests in a narrow, temporally limited manner, ultimately targeting offenders who have committed certain sexual offenses prohibited by Missouri law (or comparable sexual offenses from other jurisdictions).

Therefore, even if this Court considers Sanderson's late-arriving motion

21

for a temporary restraining order, this Court should deny the motion because Sanderson has not shown any likelihood of success on the merits of his First Amendment claim.

> **D.    Our nation's history and tradition do not prohibit the State from requiring sex offenders to post notice that there are "no treats or candy at this residence" as part of a scheme to protect children on Halloween.**

Although courts have not yet required an analysis of history and tradition in a First Amendment analysis, even if it were required, Sanderson cannot argue that the history and tradition of the framing era lacked a concept of a duty to warn, particularly when it comes to children.  Traditionally, our nation has recognized that children are unable to make decisions for themselves and often require additional supervision to avoid dangerous circumstances and to avoid potentially life-altering decisions. To that end, our tradition recognizes a greater duty of care when children are involved. The wisdom of this common-sense approach is reflected in this case in the discussion between a police officer and a neighborhood parent, who was dismayed that he unwittingly allowed his children to visit the residence of a sex offender on Halloween. Ex. 14 at 12:56–14:08.

Sanderson, for his part, argues that this Court should continue to apply prior cases involving compelled speech and means-end scrutiny, an analysis which this statute survives, as discussed throughout the rest of this brief. Doc.

22

7-1 at 11. But it also survives a historical analysis such as that employed in *New York State Pistol & Rifle v. Bruen*, 142 S. Ct. 2111 (2022), where the Supreme Court recognized *District of Columbia v. Heller* 554 U.S. 570 (2008)'s use of history and tradition. *Bruen*, 142 S. Ct. at 2130.

Under the history and tradition rubric, Missouri's statute survives Sanderson's challenge. The Missouri statute at issue—§ 589.426—establishes a criminal act and sets forth a criminal penalty designed to protect children from contact with sex offenders. The statute prohibits sex offenders from having "Halloween-related contact with children." § 589.426.1(1). It requires sex offenders to remain inside his or her residence between 5:00 p.m. and 10:30 p.m. on Halloween. *Id*. at (2). It requires sex offenders "to post a sign at his or her residence stating, 'No candy or treats at this residence.'" *Id*. at (3). And it requires sex offenders to leave "all outside residential lighting off during the evening hours after 5:00 p.m." *Id*. at (4). Although Sanderson only challenges the sign-posting requirement, the text and structure of Missouri's statute must be considered as a whole because it is a comprehensive scheme to protect Missouri children from sex offenders. *See, e.g., Nw. Airlines, Inc. v. Transp. Workers Union of America, AFL-CIO*, 451 U.S. 77, 97 (1981) ("The judiciary may not, in the face of such comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs.").

23

Our nation has a history and tradition of recognizing affirmative duties to warn individuals in a variety of circumstances regarding potential dangers. For example, in *Fogerty v. Pratt*, 9 F. Cas. 332, 333 (D. Pa. 1809), a group of sailors had been transferring stone ballast from their ship to a nearby scow, pursuing the matter so carelessly that they sank the scow. In finding all of the sailors liable (in proportion to their wages) with the first mate who had initially directed the operations, the court held "[i]f the second mate or any of the crew had deemed (as the former said he had) this mode of lading the ballast uncommon, or dangerous, it was their duty to have represented the matter to the mate." *Id.* In *Carleton v. Franconia Iron & Steel Co.*, 99 Mass. 216, 219 (Ma. 1868), the Supreme Judicial Court of Massachusetts, in finding for the plaintiff in an award of damages resulting from a known danger near a wharf stated, "It is immaterial in this case whether the danger had been created or increased by the excavation made by the defendants, or had always existed, if they, knowing of its existence, neglected to remove it *or to warn* those transacting business with them against it." (emphasis added). In explaining its ruling, the court stated:

> This case cannot be distinguished in principle from that of the owner of land adjoining a highway, who, knowing that there was a large rock or a deep pit between the travelled part of the highway and his own gate, should tell a carrier, bringing goods to his house at night, to drive in, without warning him of the defect, and who would be equally liable for an injury sustained in acting upon his

24

invitation, whether he did or did not own the soil under the highway.

*Carleton*, 99 Mass. at 219.

As recognized by the Supreme Court, this duty extended to what would later become known as attractive nuisances:

> "[T]he duty of one who invites another upon his land not to lead him into a trap is well settled, and while it is very plain that temptation is not invitation, it may be held that knowingly to establish and expose, unfenced, to children of an age when they follow a bait as mechanically as a fish, something that is certain to attract them, has the legal effect of an invitation to them although not to an adult. But the principle if accepted must be very cautiously applied."

*United Zinc & Chem. Co. v. Britt*, 258 U.S. 268, 275 (1922).

Missouri has long followed the attractive nuisance rule. For example, in *Hull v. Gillioz*, 130 S.W.2d 623, 627 (Mo. Div. 1 1939), the Missouri Supreme Court affirmed a judgment for failure to avoid and properly warn of an attractive nuisance against a construction company for maintaining a pile of steel beams on which children played and where the plaintiff was killed. In so holding, the Missouri Supreme Court explained that the attractive nuisance doctrine applies when children are attracted to a property due to a dangerous instrumentality or condition and where the instrumentality or condition is inherently dangerous.

A sex offender's Halloween display, such as the one put up by Sanderson

25

last year, is an inherently dangerous instrumentality or condition that is attractive to children. And as the above cases make clear, although sex offender registration statutes may be comparatively new, there is a long history and tradition in this country of requiring individuals to warn others of inherently dangerous conditions. This long-standing, common-sense approach does not now, and has never violated the First Amendment, including the relatively recent "compelled speech" doctrine.

There is also a long history and tradition of regulating conduct and speech directed at minors. For instance, Justice Thomas noted that speech directed to minors without parent or guardian approval is not speech traditionally protected by the First Amendment. *Brown v. Entm't. Merch. Ass'n*, 564 U.S. 786, 821 (2011) (Thomas, J, dissenting) ("The practices and beliefs of the founding generation establish that 'the freedom of speech,' as originally understood, does not include a right to speak to minors (or a right of minors to access speech) without going through the minors' parents or guardians."). Justice Thomas continued, stating that the Courts should analyze the First Amendment and its protections by considering the meaning of the constitutional amendment at the time of its adoption, *id.* at 822, before recounting the historical tradition and practices of the founding era (and the period immediately preceding the founding). *Id.* at 823–832. After considering

26

the historical record, Justice Thomas explained that the law of founding era supported the founding generation's "concept of total parental control" over children and often reflected parental concerns supporting "parental authority with the coercive power of the state." *Id.* at 835. In light of that history, Justice Thomas reasoned, "the Framers could not possibly have understood 'the freedom of speech' to include an unqualified right to speak to minors." *Id.* at 835. And specifically, "that the founding generation would not have understood 'the freedom of speech' to include a right to speak to children without going through their parents. *Id.*

As recognized by Justice Thomas's dissenting opinion in *Brown*, our history and tradition does not prohibit the State from using its coercive police power to curtail the speech of individuals to further that tradition of protecting children. *Brown*, 564 U.S. at 835 (Thomas, J, dissenting), and the historical correlaries to this duty to warn make clear that in no way is the concept of a small sign stating "no candy" antithetical to our history and tradition

**III.     The balance of the harms favors denying the temporary restraining order: Sanderson would suffer *de minimus* harm, if**

**any, by being required to post a small sign and turn off his porch light; Missouri, on the other hand, would be gravely harmed by a statewide injunction of its criminal code.**

Sanderson has requested a statewide injunction of §589.426.1(3), but the balance of the harms weighs in favor of Missouri, not Sanderson. In order to obtain a statewide injunction, Sanderson must make a successful facial challenge to the statute. *Brakebill v. Jaeger*, 932 F.3d 671, 677 (8th Cir. 2019). And facial challenges "are disfavored[.]" *Id.* (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–51 (2008)).

The alleged harm suffered by Missouri sex offenders is that they will be required to post a sign designed to discourage children from coming to their residences on Halloween. This sign does not contain an ideological or political belief or creed, and must only be posted for a few hours. This harm is *de minimus*. Sanderson also implies that he will be subject to reputational harm. Doc. 7-1 at 8, 16. But any reputational harm here is so limited as to not even reach the standard for Article III standing.[3] *Spencer v. Kemna*, 523 U.S. 1, 17 (1998).

Missouri, on the other hand, will suffer considerable harm if its criminal laws are subject to a statewide injunction. *Calderon*, 523 U.S. at 556 ("the

---

[3] Sanderson's decision not to proceed under a pseudonym further suggests that his complaints about his reputation are not well founded.

power of a State to pass laws means little if the State cannot enforce them."). Missouri suffers the risk of other harms as well. Although Sanderson disputes the risk posed by sex offenders to the public, the reality is that Missouri's statute is designed to prohibit "Halloween-related contact" with children. § 589.426.1. The sign-posting requirement is one avenue to accomplish this goal. And the record in this case shows that sex offenders will distribute candy to children on Halloween. While some sex offenders will violate Missouri's criminal laws, the challenged statute has a deterrent effect, and the increased risk to Missouri's children is part of the balance of the harms.

Additionally, granting the temporary restraining order raises weighty questions of potential state liability. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198 (1989) ("in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."). Missouri's duly elected General Assembly has made the decision to protect children from predations by sexual offenders year-round and especially on Halloween, the celebration of which results in a dramatically increased presence of unsupervised or lightly supervised children. Missouri's simple sign requirement was made to protect the public on this particular holiday based on well-established federal and state statutory regimes; were any harm to befall a child as a result of this

29

temporary restraining order, an argument for state liability on the basis of that preventable harm would not be out of the question. This risk further pushes the balance of harms in favor of Missouri.

## IV.    The public interest weighs heavily in favor of the State of Missouri.

The issuance of temporary restraining order will not serve the public's interest for at least four reasons.

*First*, Sanderson's previous conduct has demonstrated that, without State intervention, Sanderson will flout the State's sex offender law (irrespective of the signage provision of § 589.426.1(3)) and have contact with children. Sanderson's previous flagrant misconduct was captured on camera and as discussed above included an apparently intoxicated Sanderson being found inside his Halloween display (while trick-or-treaters were visiting his residence) and outbursts from Sanderson about that "[t]hat sixteen year old bitch girl, little girlfriend of my daughters." *See, e.g.,* Ex. 3 at 12; *see also* Ex. 13 at 5:55–6:06. It is also worth noting that Sanderson was apparently intoxicated during both instances – and that in a moment of introspection or deflection (his apology letter) before his first conviction, he said that "'alcoholism turns him into a person he is not . . . .'" Ex. 2 at 7. The simple requirements of this law prevent Sanderson from further alcohol fueled contact with children, with *de minimis* to no additional impact to him.

30

*Second*, Sanderson has conceded that the State has a compelling interest in protecting children from sexual offenders and merely argues that the State's law is not narrowly tailored. Doc. 17-1 at 17. Despite pleading guilty under the law after last year's Halloween celebration, Sanderson waited until less than three weeks before this year's Halloween celebration to file the instant motion for a temporary restraining order. He has not explained the reason for this delay and, while the State continues to assert Sanderson is wrong about his narrow tailoring argument, granting a temporary restraining order on a quasi-emergency basis resulting from an emergency—entirely of Sanderson's making—does not serve the public's interest because it prevents the State from advancing its compelling interest in protecting children.

*Third*, the public's interest rests in enforcing the laws passed by the People's representatives in Missouri's General Assembly unless those laws have been found to be unconstitutional after full and fair consideration of the law itself. This is particularly true when the challenged law is a criminal law as our system of law "recognizes the independent power of a State to articulate societal norms through criminal law; but the power of a State to pass laws means little if the State cannot enforce them." *Calderon*, 523 U.S. at 556. Indeed, "the power to convict and punish criminals lies at the heart of the States' 'residuary and inviolable sovereignty.'" *Shinn v. Ramirez*, 596 U.S. 366,

376 (2022) (quoting The Federalist No. 39, p.245 (C. Rossiter ed. 1961)). "Thus, [t]he States possess primary authority for defining and enforcing the criminal law . . . and for adjudicating constitutional challenges to state convictions[.]" *Id.* (citations and quotations omitted) (brackets in original).

Here, a statewide preliminary injunction would represent a significant and unwarranted intrusion into Missouri's lawful police power, *see id.*, and would strike a harsh blow against Missouri's constitutional legislative authority by enjoining a statutory provision developed through a "presumptively reasoned or democratic" process. *Rounds*, 530 F.3d at 732. Sanderson filed a late-arriving motion for a temporary restraining order seeking to enjoin the enforcement of a portion of Missouri's criminal law, but he has not sought review in Missouri courts and has arrived in this Court invoking an emergency of his own creation. Under those circumstances, the public interest lies in the continued enforcement of § 589.426 unless and until Sanderson can actually show his First Amendment rights have been violated by Missouri's law.

*Fourth*, Sanderson's argument concerning the public interest is unavailing. That argument appears to rest entirely on his argument that a signage requirement is unconstitutional and singles him out for unidentified danger. Doc. 7-1 at 18. Elsewhere in his motion, Sanderson appears to assert

that this danger is unspecified Halloween mischief and community harassment. Doc. 7-1 at 6, 18. Taking those assertions in turn, for the reasons expressed above, Sanderson has not made a showing of a likelihood of success on the merits that § 589.426.1(3) is unconstitutional.  Sanderson's arguments about danger are similarly overblown. Putting aside the fact that Sanderson's allegations of mischief-related danger are entirely speculative, any Halloween mischief rising to the level of a crime against Sanderson will be subject to a police response and potentially criminal prosecution.

Further, a sign stating Sanderson's residence does not have candy or treats would likely not have been conspicuous or a subject of discussion without Sanderson's instant lawsuit. And Sanderson's status as a sexual offender is a matter of public record that is publically available year around and does not arise from the posting of a Halloween sign. If this Court were to adopt Sanderson's public interest argument to its logical conclusion, it would apply equally to Missouri's entire sexual registration law (which is modeled, at least in part, on the federal registration law). That argument asks too much especially when taken in the context of the extraordinary remedy offered by preliminary injunctive relief. *See Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

The public's interest lies in allowing Missouri to continue to enforce its

criminal laws designed to protect children during the pendency of this litigation.

## Conclusion

This Court should deny the request for a temporary restraining order.

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

/s/ *Gregory M. Goodwin*
GREGORY M. GOODWIN
Assistant Attorney General
Missouri Bar #65929

/s/ *Andrew J. Clarke*
ANDREW J. CLARKE
Assistant Attorney General
Missouri Bar #71264

P.O. Box 899
Jefferson City, MO 65102
(573) 751-7017
(573) 751-2096 Fax
gregory.goodwin@ago.mo.gov
andrew.clarke@ago.mo.gov

Attorneys for Attorney General Bailey

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a true and correct copy of the foregoing, and any attachment, was electronically filed using the CM/ECF system on October 18, 2023. All counsel of record will receive service by operation of the CM/ECF system.

                    */s/ Gregory M. Goodwin*
                    GREGORY M. GOODWIN
                    Assistant Attorney General