# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| THOMAS L. SANDERSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-CV-01242-JAR |
| | ) | |
| ANDREW BAILEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## Defendant Attorney General Andrew Bailey's
## Post Trial Brief

# TABLE OF CONTENTS

TABLE OF CONTENTS................................**Error! Bookmark not defined.**

TABLE OF AUTHORITIES ............................................................. i

INTRODUCTION ......................................................................... 1

      Summary ........................................................................ 5

   I.  The Plaintiff lacks standing to press this suit. ...................... 5

  II. Sanderson has not satisfied the new *NetChoice* balancing test, which requires identifying all applications of a law and measuring unconstitutional applications against constitutional ones. ............... 10

      NetChoice Changes the Court's Analysis ........................................ 12

      "All Applications" Includes Repeat Offenders, Sexually Violent Predators ..................................................................... 14

  III. Even under the previous "levels of scrutiny analysis", a lower level of scrutiny would have been appropriate, and the law also survives any level of scrutiny under older tests, as well as a history and tradition analysis. ................................................................. 26

      The history and tradition of the First Amendment allow for restrictions on sex offenders, including the sign posting mandate. ......................................................................... 30

  IV. This Court, if it determines relief is necessary, lacks the authority to craft a state-wide remedy under *Labrador*. .................................... 34

CONCLUSION AND PRAYER FOR RELIEF ............................................. 37

CERTIFICATE OF SERVICE ........................................................... 39

TABLE OF AUTHORITIES

**Cases**

*Balogh v. Lombardi,*
   816 F.3d 536 (8th Cir. 2016) ........................................................................ 11

*Calderon v. Thompson,*
   523 U.S. 538 (1998) .................................................................................... 40

*Care & Treatment of Scates v. State,*
   134 S.W.3d 738 (Mo. Ct. App. 2004) .......................................................... 30

*Cohen v. California,*
   403 U.S. 15 (1971) ...................................................................................... 36

*Connecticut Dep't of Pub. Safety v. Doe,*
   538 U.S. 1, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003) .......................... 23, 24

*Croxton v. State,*
   293 S.W.3d 39 (2009) ............................................................................ 25, 26

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ........................................................................................ 37

*In re Care & Treatment of Burgess,*
   147 S.W.3d 822 (Mo. Ct. App. 2004) .......................................................... 30

*In re Cozart,*
   433 S.W.3d 483 (Mo. Ct. App. 2014) .......................................................... 29

*In re Shafer,*
   171 S.W.3d 768 (Mo. Ct. App. 2005) .......................................................... 27

*In re SuperValu, Inc.,*
   870 F.3d 763 (8th Cir. 2017) .......................................................................... 7

*Kirk v. State,*
   520 S.W.3d 443 (Mo. 2017) ........................................................................ 40

*Labrador v. Poe,*
   144 S. Ct. 921 (2024) ...................................................................... 52, 53, 55

*Lewis v. State,*

152 S.W.3d 325 (Mo. Ct. App. 2004) ............................................................ 30

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................................. 6, 8

*Martineau v. State*,
242 S.W.3d 456 (Mo. Ct. App. 2007) ........................................................... 29

*McGuire v. Marshall*,
2024 WL 2401833 (M.D. Al. May 23, 2024) ........................................... 41, 42

*Minnesota RFL Republican Farmer Labor Caucus v. Freeman*,
33 F.4th 985 (8th Cir. 2022) ....................................................................... 11

*Mo. Prot. & Advocacy Servs.*,
499 F.3d 803 (8th Cir. 2007) ....................................................................... 11

*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024) ................................... 13, 14, 15, 16, 17, 18, 19, 20, 21

*New York State Rifle & Pistol Association v. Bruen*,
597 U.S. 1 (2022) .................................................................................. 45, 47

*Phelps-Roper v. City of Manchester, Mo.*,
697 F.3d 678 (8th Cir. 2012) ....................................................................... 52

*Rahimi. United States v,*
. Rahimi, 144 S. Ct. 1889 (2024) ................................................. 45, 46, 47, 48

*Rodgers v. Bryant*,
942 F.3d 451 (8th Cir. 2019) ....................................................................... 53

*Rumsfeld v. FAIR.*,
547 U.S. 47 (2006) ........................................................................... 37, 38, 39

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................... 5, 6, 7

*State v. Crockett*,
419 S.W.2d 22 (Mo. Div. 2 1967) ................................................................... 8

*State v. Todd*,
433 S.W.2d 550 (Mo. Div. 2 1968) ............................................................... 10

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) .................................................................... 6

*United States v. Cunningham,*
70 F.4th 502 (8th Cir. 2023) ................................................... 46

*United States v. Dunn,*
76 F.4th 1062 (8th Cir. 2023) ................................................. 46

*United States v. Hansen,*
599 U.S. 762 (2023) ................................................ 15, 16, 19, 24

*United States v. Jackson,*
69 F.4th 495 (8th Cir. 2023) ................................................... 46

*United States v. O'Brien,*
391 U.S. 367 (1968) ............................................................ 36, 37

*United States v. Veasley,*
98 F.4th 906 (8th Cir. 2024) ................................................... 46

*Wash. State Grange v. Wash. State Republican Party,*
552 U.S. 442 (2008) ................................................................. 52

**Statutes**

Mo Rev. Stat. § 71.200 .............................................................. 8

Mo Rev. Stat. §§ 43.010–43.659 ............................................... 9

Mo. Rev. Stat. § 27.030 ...................................................... 10, 11

Mo. Rev. Stat. § 287.128 ........................................................... 9

Mo. Rev. Stat. § 56.060.1 ........................................................ 10

Mo. Rev. Stat. § 566.147 ......................................................... 43

Mo. Rev. Stat. § 589.400–§ 589.426 ....................................... 43

Mo. Rev. Stat. § 589.401.17 .................................................... 44

Mo. Rev. Stat. § 589.426.1(1)-(4) ........................................... 49

Mo. Rev. Stat. § 589.426.3 ............................... 11, 44, 50, 51, 54

Mo. Rev. Stat. §§ 57.010–57.570 ........................................................................ 9

Mo. Rev. Stat. §§ 84.015–84.860 ........................................................................ 9

Mo. Rev. Stat. 632.495 ........................................................................................ 25

Rules

Fed. R. Civ. P. 12(h)(3) ...................................................................................... 13

Other Authorities

Christine Byers, *Crawford County School Districtpays molestation victim $3.1M after hiring convicted sex offender as bus driver*,KSDK (Apr. 16, 2024, 4:49 P.M), https://www.ksdk.com/article/news/investigations/ missouri-school-district-pays-molestation-victim-3-1-million-hired-convicted-sex-offender-school-bus-driver/63-93ec0e38-e293-47ba-a91d-d50814c8710e ...................................................................................... 34

## INTRODUCTION

Halloween is the one night a year when parents across the State of Missouri encourage children to let down their guards to accept candy or treats from strangers.  Those who have committed sexual offenses have proven they are unable to follow the law, in some cases committing some of the worst offenses there are against children: rape, sexual assault, sodomy, and other heinous sexual crimes against the most vulnerable in society.

Missouri's sign posting requirement is a prophylactic statute that protects those most vulnerable victims from the risk of being targeted or groomed for future victimization by offenders who have shown at least once that they don't care what society thinks, or what the law says. The law does so by requiring certain minimal conduct – posting of a sign, which is a collateral consequence of an offender's conviction.  Running counter to the hypothetical posed by the Court to several witnesses, that the sign could be posted anywhere, "even inside a person's house," not one witness testified they had ever seen someone actually try to post a sign anywhere other than the front door. This belies the clear intent of the Missouri statute which all witnesses understood and all evidence before the court shows: the sign should be posted visibly, so that families trick-or-treating can see it.  Missouri's legislature was well within its rights to enact such a statute to place appropriate limitations on conduct of offenders in the society they have so horribly betrayed.

1

The signage requirement provides a proverbial "picket fence" to keep a conveyor belt of potential victims off an offender's doorstep on this one, unique night of the year where children are encouraged to approach and accept candy from complete strangers. Courts in this state and circuit have repeatedly upheld various sex offender registration requirements and restrictions as appropriate limitations on conduct – appropriate collateral consequences of an offenders' action – those consequences allow offenders back into society with restrictions that delineate the bounds of appropriate conduct help keep society safe.

The Court heard testimony throughout trial about the efficacy of Missouri's Halloween sign posting mandate: the benefit to law enforcement, to society, and even to offenders. The Court heard from law enforcement and mental health professionals on how this law prevents sexual offenders from using Halloween night to groom or build relationships with future victims. It also ensures children and their parents know why a porch light is off—not to make a more spooky atmosphere or because the bulb is dead—but because there is "no candy or treats at this residence." And the Court heard how the sign allows law enforcement driving by at any point in the evening to verify that the resident of that home is an offender and is aware of and in compliance with at least the sign posting portion of the state's Halloween statute.  Posting the required sign thus gives offenders clear guidelines and a clear way to signal

2

that they are in compliance with those guidelines—without coming out and saying they are sex offenders.

Contrasted to those compelling interests, the Court heard about the behavior of the Plaintiff himself: a textbook example of a person who, time and time again, displays complete disregard for the law and shows no remorse when he breaks it. The Court heard testimony and took evidence about Thomas Sanderson's five convictions for driving while intoxicated, his abuse of numerous substances, his domestic abuse of various partners, his various physical assaults on neighbors or complete strangers, his "mooning" of children in a taco bell, his public urination, and finally, sodomy on a child. And, Court heard about from Brittany Cale, the then young girl the Plaintiff groomed and then victimized a little over a score of years ago, despite his claims of innocence.

The Court must apply the test from the Supreme Court's newly minted *NetChoice* analysis, and, in analyzing every possible application of this law, find that the constitutional applications of this law far outweigh any "hard case" hypothetical situations. This law furthers important government interests by means that are substantially related to those interests: protecting society from predators by requiring them to tell parents and children there is "no candy or treats" at their residences on Halloween night. But the evidence in this case shows that the law survives any level of scrutiny because the law serves compelling state interests and is narrowly tailored to protect the most

vulnerable from those who have shown they have preyed sexually on others in the past. Specifically, the law protects children from grooming by sex offenders (preventing a conveyor belt of victims from knocking on their doors); enabling enforcement of sex offender registration requirements; allowing for the facially neutral identification of sex offenders by the State; and the State has a right to enact criminal laws and enforce laws on collateral consequences of sexual criminal convictions.

Thomas Sanderson is Exhibit A of why this law exists—to help parents and children know not to knock on the door of an offender who may use that opportunity to groom them for future victimization. Dr. Simpson, Forensic Psychologist for Attorney General Bailey, discussed that such grooming behavior is a perennial concern when considering the risks posed to society by predatory adults who seek child victims. And the Court is well aware that grooming behaviors may not be apparent as such: as the court asked and Dr. Simpson answered, the behavior of a groomer may appear exactly the same as a person who is well intentioned. Indeed, the only difference is the predatory result. Only the sign on the door helps parents and children distinguish the homes they should visit from those they should avoid.

Finally, the Court should deny Plaintiffs petition in whole; however, if it does anything short of that request, a plurality of justices in recent Supreme Court case *Poe v. Labrador* make it clear that the Court must limit statewide

injunctive relief to the plaintiff himself, not every offender in the state.

### *Summary*

The Court should rule for Defendants for four reasons. *First*, the Plaintiff lacks standing to press this suit. *Second*, Sanderson has not satisfied the new *NetChoice* balancing test, which requires identifying all applications of a law and measuring unconstitutional applications against constitutional ones. *Third*, even under the previous "levels of scrutiny analysis", a lower level of scrutiny would have been appropriate; the law survives any level of scrutiny under older tests; and history and tradition allow for reasonable limitations on a person's freedom of expression including compelled statements in cases of risks or threats to children such as those posed by Sex Offenders on Halloween Night. And *fourth*, the Supreme Court has recently made clear in *Poe v. Labrador* that any remedy this Court deems appropriate may relate only to the Plaintiff, not the entire State.

## I.     The Plaintiff lacks standing to press this suit.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). This is because "[f]ederal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The

"'irreducible constitutional minimum' of standing consists of three elements."
*Spokeo*, 578 U.S. at 338 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555,
560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is
fairly traceable to the challenged conduct of the defendant, and (3) that is likely
to be redressed by a favorable judicial decision." *Id.* And Sanderson, "as the
party invoking federal jurisdiction, bears the burden of establishing these
elements." *Id.*

Sanderson has failed to show that any alleged harm is fairly traceable to
the Attorney General.  Even though he was given the opportunity to present
evidence at the hearing in this matter, Sanderson failed to present a single
piece of evidence. Instead, Sanderson was forced to admit—just as he did in his
deposition—that he did not even know who Andrew Bailey was. "An injury is
fairly traceable if the plaintiff shows 'a causal connection between the injury
and the conduct complained of' that is 'not ... th[e] result [of] the independent
action of some third party not before the court.'" *In re SuperValu, Inc.*, 870 F.3d
763, 768 (8th Cir. 2017) (quoting *Lujan*, 504 U.S. at 560)).

More than that, the Court heard testimony from several law enforcement
officers, including the other named defendant in this action, Chief James
Hudanick, all of which showed that the Attorney General does not manage or
supervise the long-term or day-to-day actions of law enforcement. And this is
made clear by Missouri's statutes. While the Attorney General is "the chief

6

legal officer of the State," *State v. Crockett*, 419 S.W.2d 22, 28 (Mo. Div. 2 1967), his charge does not include the supervision of the operations of law enforcement officers, which are organized and supervised by other elected, appointed, or hired officials at the local, county, or state level. *See, e.g.*, Mo Rev. Stat. § 71.200 (authorizing all cities within Missouri to appoint members of a police force and prescribe their duties); Mo. Rev. Stat. §§ 84.015–84.860 (law enforcement provisions applicable to St. Louis and Kansas City); Mo. Rev. Stat. §§ 57.010–57.570 (creating position of sheriff, authorizing the hiring of deputies and other employees, and providing authorities and duties); Mo Rev. Stat. §§ 43.010–43.659 (creating Missouri State Highway Patrol, authorizing the appointment of a superintendent and the hiring of officers and patrolmen, and providing authorities and duties).

The same is true about any criminal prosecution Sanderson alleged that he may face for any future violation of the Halloween sign-posting requirement. The Attorney General, with some exceptions not relevant here, *see, e.g.*, Mo. Rev. Stat. § 287.128 (authorizing the Attorney General to enforce provisions of State's code involving the failure to maintain workers' compensation insurance), does not have original jurisdiction to prosecute criminal offenses. Instead, that obligation falls to elected, county-level prosecuting attorneys, Missouri Revised Statute § 56.060.1, which have been "carved out of" the Attorney General's authority to "enforce any and all rights

7

of the State in whatever court or jurisdiction such action may be necessary." *State v. Todd*, 433 S.W.2d 550, 554 (Mo. Div. 2 1968).

While it is true that the Attorney General may aid any prosecuting or circuit attorney "in the discharge of their respective duties in the trial courts and in examinations before grand juries, and when so directed by the trial court, he may sign indictments in lieu of the prosecuting attorney[,]" Missouri Revised Statute § 27.030, Sanderson has not presented any evidence that that limited authority to assist county-level prosecuting attorney occurred in his prior criminal case or anything but bare speculation that it may ever occur in the future.[1]

Put simply, Sanderson asserts a facial challenge to the sign-posting requirement of Missouri Revised Statute § 589.426.3, but he has failed to show that the Attorney General has any role in the actual enforcement of that statute; therefore, he has failed to show that any alleged injury is fairly traceable to any action or the conduct of the Attorney General. This failure is

---

[1] While the United States Court of Appeals for the Eighth Circuit has found that § 27.030 is sufficient basis for a court to find, in some circumstances, that the Attorney General cannot invoke Eleventh Amendment immunity, *Mo. Prot. & Advocacy Servs.*, 499 F.3d 803, 807 (8th Cir. 2007), Article III standing presents a distinct issue from Eleventh Amendment immunity. *See Minnesota RFL Republican Farmer Labor Caucus v. Freeman*, 33 F.4th 985, 989 n.4 (8th Cir. 2022); *see also Balogh v. Lombardi*, 816 F.3d 536, 541 n.1 (8th Cir. 2016). At bottom, Sanderson has failed to prove that any alleged injury was fairly traceable to the Attorney General and the failure to demonstrate standing requires dismissal.

fatal to his claim.

Second, Sanderson has failed to demonstrate that any alleged harm allegedly caused by the Attorney General is redressable by a favorable judicial ruling against the Attorney General. As discussed above, the Attorney General does not supervise or control law enforcement officers across the state and any ruling against him, or Chief Hudanick for that matter, would fail to offer the redress Sanderson requests by making a facial challenge to the statute. Indeed, even if this Court were to give Sanderson the relief he requests—a state-wide injunction against the Attorney General and Chief Hudanick—that relief would not bind any of the other law enforcement agencies across the state that the Attorney General does not, and cannot, supervise.[2] While Sanderson could have attempted to mount an as-applied challenge, he chose not to, and he must now bear the standing burden of that choice. He failed to carry that standing burden after an evidentiary hearing. Therefore, Sanderson lacks standing and this case should be dismissed. *See* Fed. R. Civ. P. 12(h)(3) ("If the court

---

[2] While a ruling from this Court may be able to practically redress, state-wide, this alleged harm because other law enforcement agencies may be reasonably chilled from enforcing the statute in the face of a judgment from this Court declaring § 589.426.3 unconstitutional, the sort of state-wide remedy that would exert that chilling effect is a strong medicine that requires Sanderson to carry an extremely high burden. As discussed in greater detail below, Sanderson has failed to carry his burden and this Court should deny the request for state-wide injunctive relief.

determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

## II. Sanderson has not satisfied the new *NetChoice* balancing test, which requires identifying all applications of a law and measuring unconstitutional applications against constitutional ones.

While this Court previously issued a preliminary injunction, the Supreme Court's recent *NetChoice* decision makes clear that Sanderson cannot obtain relief without this Court first assessing *all* potential applications of the statute. In *NetChoice*, for example, the Supreme Court ruled against NetChoice for raising a facial challenge (instead of an as-applied challenge) while failing to present to the district courts "the full range of activities the laws cover, and measure the constitutional against unconstitutional applications." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2388 (2024). As the Supreme Court put it

> NetChoice **chose to litigate these cases as facial challenges, and that decision comes at a cost**. For a host of good reasons, courts usually handle constitutional claims case by case, not en masse. Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement. And facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways. This Court has therefore made facial challenges hard to win. (emphasis added).

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (internal citations and quotations omitted) (emphasis added). *NetChoice* thus makes clear that Sanderson cannot prevail without first identifying for this Court "the full range

of activities" covered by the law, assessing which applications of the law are constitutional, and establishing that "the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at *2397.

In short, *NetChoice* clarified anew the standard for facial challenges and requires analysis of *all* applications of a law. *Id.* That means assessing not only whether this statute is constitutional as applied to Sanderson, but also whether it is constitutional as applied to each of the more than seventeen thousand active offenders in Missouri, including those who are or will be designated "sexually violent predators" for repeatedly committing sexual offenses. And similarly, *United States v. Hansen* requires that as part of this analysis, the Court consider any unconstitutional applications against provisions that involve "nonexpressive conduct—which does not implicate the First Amendment at all." *United States v. Hansen*, 599 U.S. 762, 782 (2023). Moreover, except in cases of over-breadth of a statute, "courts must handle unconstitutional applications as they usually do—case-by-case." *Id.* at 770.

Because the statute challenged here regulates both the conduct *and* speech of sex offenders, Sanderson's facial challenge can prevail only if "the law's unconstitutional applications" with respect to speech "substantially outweigh its constitutional ones" with respect to conduct, *NetChoice*, 144 S. Ct. at *2397; *Hansen*, 599 U.S. at 781–82.

11

### *NetChoice Changes the Court's Analysis*

In *Moody v. NetChoice, LLC* the Supreme Court considered whether preliminary injunctions had been appropriate in facial challenges to Florida and Texas laws on the grounds that they violated the First Amendment. *NetChoice*, 144 S. Ct. at 2383. Lower courts had disagreed on the appropriateness of such injunctions. *Id.* The Eleventh Circuit had allowed an injunction, finding the law would likely not survive review. *Id.* The Fifth Circuit had denied a similar injunction on the grounds that it did not implicate the First Amendment. *Id.* The Court vacated both decisions, finding the circuit courts had not properly reviewed the underlying facial challenges. *Id.* The Supreme Court found that the question to be considered in a facial challenge is not just whether there are unconstitutional applications of a law, but instead "whether a law's unconstitutional applications are substantial compared to its constitutional ones." *Id.*

When raising a facial challenge in the First Amendment context, a plaintiff must show that a law "lack[s] a plainly legitimate sweep under the First Amendment . . . [and] must show that the law at issue prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Id.* at *2397. A plaintiff who only shows that a particular application of the law is unconstitutional does not carry their burden. When such a challenge is brought, a court must consider "whether a substantial number of

the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at *2397 (internal quotation marks omitted) (quoting *Americans for Prosperity Foundation v. Bonita*, 549, U.S. 595 (2021)); *Id.* at *2408-9 ("To succeed on its First Amendment claim, [a plaintiff] must show the law at issue … prohibits a substantial amount of protected speech relative to its plainly legitimate sweep") (quoting *Hansen*, 599 U.S. at 770).

In considering this question, courts must complete a two-step analysis. First, the court must consider the entirety of the challenged law's scope. *NetChoice* 144 S. Ct. at *2398 ("before a court can do anything else with these facial challenges, it must … determine what the law covers"). Second, a court must determine which, if any, of these applications violate the First Amendment and if unconstitutional applications outweigh the valid applications of a law. *Id.* The application that involves the plaintiff receives no additional weight in this comparison. *Id.* ("To decide the facial challenges here, the courts below must explore the laws' full range of application—the constitutionally impermissible and permissible both—and compare the two sets."). Only if the unconstitutional applications of a law outweigh all constitutional applications can the law be facially invalidated.[3]

---

[3] *Id.* ("To decide facial challenges here, the courts below must explore the laws' full range of application—the constitutionally impermissible and permissible both—and compare the two sets.").

The Supreme Court in *NetChoice* noted that a primary flaw in the analysis of the two lower courts was their failure adequately to determine all of the applications of the challenged laws.[4]  Both courts had focused their analysis on the applications of the challenged law that implicated the plaintiffs.[5]  However, such a myopic focus was inappropriate when analyzing a facial challenge.

### *"All Applications" Includes Repeat Offenders, Sexually Violent Predators*

The instant case, similar to *NetChoice*, is a facial challenge of a state statute alleging a violation of the First Amendment.  Therefore, in determining if the plaintiff's facial challenge can succeed, this Court must consider *all* applications of the Halloween statute, determine which are constitutional and unconstitutional, and finally determine if any unconstitutional applications outweigh the constitutional ones.  This analysis is easy: all applications of this law are constitutional as this is an incredibly minor burden on individuals for a significant benefit to the safety of Missouri's children on Halloween night.  However, even if the court believes the law is unconstitutional in some applications, it is constitutional in the great majority of applications.

At trial, the court heard evidence and testimony on the application of

---

[4] *Id.* at *5.

[5] *Id.* ("The courts mainly addressed what the parties had focused on … a court must determine a law's full set of applications").

this statute to sex offenders across the state.  Defendant's Trial Exhibit XX,[6] lists 17,367 active offenders in the state of Missouri as of March 5, 2024.  In weighing whether the statute is constitutional or not, this Court must consider the application of the sign posting mandate to every one of them—all offenders this mandate prevents from interacting with children on Halloween night by telling them and their parents "no candy or treats at this residence."  Those 17,367 offenders include many criminals who have committed sexual misconduct against children, some of them repeatedly.  And though, because of *Poe v. Labrador* discussed below, the relief sought cannot extend to those offenders, the constitutionality of the statute must be analyzed in its application to all of them.  Even if the signage requirement is not constitutional as applied to more minor offenders, it is constitutional with respect to repeat offenders and offenders who have engaged in shocking misconduct.

The government interest in the signage requirement—which deters interaction between sex offenders and potential victims—is substantial compared to the miniscule (if any) effect on the speech of these individuals. *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 4, 123 S. Ct. 1160, 1163, 155 L. Ed. 2d 98 (2003). Indeed, the Supreme Court has explained that

> Sex offenders are a serious threat in this Nation. [T]he victims of
> sex assault are most often juveniles, and [w]hen convicted sex
> offenders reenter society, they are much more likely than any

---

[6] Exhibit XX is a listing of Missouri's Entire Sex Offender Registry.

other type of offender to be re-arrested for a new rape or sexual assault. Connecticut, like every other State, has responded to these facts by enacting a statute designed to protect its communities from sex offenders and to help apprehend repeat sex offenders.

*Id.*(internal quotations and citations omitted).

And as the Court heard in testimony from Dr. Simpson, Sgt. Penny Cole and others, any one of the interactions between a sex offender and a potential victim could either lead to a new offense or be the foundation or continuation of a grooming relationship with a future victim. In short, "[e]ven assuming that [the statute] reaches some protected speech, and even assuming that its application to all of that speech is unconstitutional, the ratio of unlawful-to-lawful applications is not lopsided enough to justify the 'strong medicine' of facial invalidation for overbreadth." *Hansen*, 599 U.S. at 765 (2023).

This is most easily seen by considering that the 17,367 active Missouri offenders includes sexually violent predators—individuals who have been found to pose such a threat of re-offense (often after repeated criminal violations) that they must be civilly committed for additional treatment due to the risk that they will not follow the laws of Missouri regarding sexual misconduct.[7] But even after commitment, some of these offenders are

_____

[7] Mo. Rev. Stat. 632.495 "If the court or jury determines that the person is a sexually violent predator, the person shall be committed to the custody of the director of the department of mental health for control, care and treatment until such time as the person's mental abnormality has so changed that the

conditionally released to the community.

For example, one of these offenders is Richard G. Croxton (Exhibit XX, rows 7791-7792). Mr. Croxton is a Sexually Violent Predator. *Croxton v. State*, 293 S.W.3d 39 (2009). The facts of Mr. Croxton's offense are as follows:

> Croxton was convicted of sexually molesting a child in Texas around 1982. Croxton had his probation transferred to Missouri in 1989. He was arrested for molesting a child in Missouri in 1992. He had first convinced the child's family that it would make financial sense for everyone if he were to move into the family's basement, and thereafter molested the child. Croxton pleaded guilty to sodomy in 1995 based on this incident, and was sentenced to a term of ten years' imprisonment.

> . . . Dr. Richard Scott of the MDMH performed the [court ordered] evaluation of Croxton . . . The State's petition to have Croxton committed to the MDMH was tried before a jury in November 2007. . . . The evidence showed that Croxton had been convicted or pleaded guilty on several occasions to charges involving sexual contact with pre-teen girls in Missouri and Texas. There was additional evidence that Croxton had had improper sexual contact with additional young girls in Texas and New Mexico in the 1980s that did not result in criminal convictions. . . . Dr. Scott also testified that it was his opinion that based on a variety of factors, Croxton was a high risk to re-offend, and it was more likely than not that he would commit further acts of sexual violence unless he was committed to a secure facility. . . . The jury found that Croxton was a SVP.

> *Croxton v. State*, 293 S.W.3d 39, 41 (Mo. Ct. App. 2009).

Croxton's conviction was upheld on appeal. *Id*. Before Croxton "convinced the child's family that it would make financial sense for everyone if he were to move into the family's basement" so he could have easy access to

---

person is safe to be at large. Such control, care and treatment shall be provided by the department of mental health."

the target of his predatory fantasies, he had clearly been known to the family in some capacity, and over time, convinced them to trust him. *Id.*

Croxton is one of many sexually violent predators in Missouri. The following cases are readily available for the Court's analysis; they are not the first individuals to be civilly committed for repeatedly failing to follow some or all of the sex offender statutes—nor will they be the last. The following are more examples of Missouri Sexually Violent Predators (SVPs) whose involuntary commitments as an SVP have been upheld on appeal:

> Jamin Shafer . . . [was] convicted of rape with armed criminal action in 1995; the victim was a 17 year-old woman. While serving his eight-year sentence for the rape conviction, Appellant participated three times in the Missouri Sexual Offender Program (MOSOP). MOSOP is cognitive behavior therapy which requires the participation of a group of sexual offenders. If members of the group do not believe the statement of one of the participants, the members will challenge that participant until he shares truthfully. Twice, Appellant failed to complete the program. . . . Appellant began his third attempt at MOSOP and managed to complete it. During this last attempt at MOSOP, Appellant admitted to his therapist and other participants that he had raped five girls from the time he was sixteen until the age of eighteen.

> *In re Shafer*, 171 S.W.3d 768, 769–70 (Mo. Ct. App. 2005).

> During his formative years, [Carl Cozart] was a voyeur, spying on his female relatives while they undressed and becoming sexually excited. In 1971, as a teenager (age 16) and in 1975, as a young adult (age 20), Appellant was discovered having sexual contact with females four to five years younger than him (ages 12 and 15, respectively). . . . In 1977, [Carl Cozart]pled guilty to a charge of assault with intent to do bodily harm. He was given 18 months of probation which he violated in 1979 and served an 18–month sentence. In 1976, 1977, 1978 and 1981, [Carl Cozart] incurred various charges including being drunk in public, common assault, resisting arrest, trespassing, peace disturbance, DWI,

18

and possession of marijuana.

In 1981, in Oklahoma City, Oklahoma, [Carl Cozart] kidnapped a 75–year–old grandmother and her twelve-and seven-year-old granddaughters from a shopping center parking lot, tied up the grandmother and sodomized the children in front of her, first the twelve-year-old, then the seven-year-old. [Carl Cozart]later said he did not want to deprive the younger child of the "pleasure," which is why he sodomized her as well.

In 1984, in St. Louis County, Missouri, [Carl Cozart] was arrested for exposing himself to two children. He was sentenced to a year in jail, execution of sentence suspended, and two years' probation. On July 1, 1984, four days into his probation, [Carl Cozart] attacked a woman jogger in a secluded, wooded area. [Carl Cozart] hid in some bushes, then ambushed her, punching her in the face and breaking her nose. [Carl Cozart] then sodomized and raped her.

On August 18, 1984, [Carl Cozart] was charged by indictment with forcible rape and sodomy. On October 24, 1984, [Carl Cozart]'s probation for the exposure case was revoked. On April 3, 1985, [Carl Cozart] pled guilty to forcible rape and sodomy and on May 3, 1985, was sentenced to 15 years on the rape count and 12 years on the sodomy count, to be served consecutively for a total of 27 years. He began serving his sentence in the Missouri Department of Corrections (MDOC) on May 9, 1985.

While in prison for these sexually violent offenses, [Carl Cozart] twice failed to complete the Missouri Sex Offender Program (MOSOP), once from December 7, 2003 to July 20, 2004 and then again from November 4, 2005 to January 24, 2006. His failures were due to his anger and disregard for the rules as well as his lack of cooperation and honesty. He was argumentative and unreceptive.

[Carl Cozart] was interviewed on April 20, 2011, by Dr. Kimberly Weitl, clinical psychologist for MDOC, Behavioral Health Sex Offender Services. Dr. Weitl concluded . . . that [Carl Cozart] had a mental abnormality, specifically (1) paraphilia not otherwise specified (NOS), nonconsent; (2) exhibitionism; and (3) antisocial personality disorder, that made him more likely than not to commit future acts of predatory sexual violence unless confined to a secure facility, and thus it was her opinion that he met the definition of an SVP . . . On February 27, 2013,

19

after a three-day trial, the jury found the State had proven by clear and convincing evidence that [Carl Cozart] was an SVP, and upon such verdict the probate division issued its Judgment and Commitment Order finding Appellant was an SVP and committing him to the custody of the DMH for control, care, and treatment until such time as his mental abnormality has so changed that he is safe to be released.

*In re Cozart*, 433 S.W.3d 483, 485–86 (Mo. Ct. App. 2014)

The Halloween statute applied to these individuals before their civil commitment, and will apply to them whenever they are released. These are three examples of many. *See also* (all cases upheld on appeal) *Martineau v. State*, 242 S.W.3d 456, 457 (Mo. Ct. App. 2007) (Martineau was "convicted and imprisoned in 1993 for sodomizing a mentally retarded boy . . . [and, at the time of his civil commitment] his pedophilia currently predisposes him to commit sexually violent offenses to a degree that causes him serious difficulty controlling his behavior"); *Lewis v. State*, 152 S.W.3d 325, 327 (Mo. Ct. App. 2004) ("Since 1980, Mr. James E. Lewis has been convicted of three sex crimes."); *Care & Treatment of Scates v. State*, 134 S.W.3d 738, 739 (Mo. Ct. App. 2004) (civilly committed after pleading guilty to two counts of sexual assault in the first degree.) *In re Care & Treatment of Burgess*, 147 S.W.3d 822, 824 (Mo. Ct. App. 2004) (civilly committed for "confinement for forcible rape, . . . and sodomy" against a woman he met in a bowling alley after being acquitted of similar offenses against two other women; in all of his crimes, Burgess showed a "deceitfulness and intimidation, showed a radical change in

20

his demeanor, and was intoxicated. Those facts and patterns, along with Appellant's refusal to participate in sex offender programs or show remorse for his crimes, provided "evidence to the mental abnormality of Antisocial Personality Disorder[.]").

These cited examples only reflect a handful of Missouri's numerous SVPs commitments; and those cases only represent those sex offenders who have been caught, found guilty, and met the rigorous standards for civil commitment for having a mental disease or compulsion that causes them to commit repeated and dangerous sexual misconduct. If given the chance, an offender like Croxton, Shafer, Cozart, Martineau, Lewis, Scates, or any other past, present or future SVP could be tempted to use Halloween to meet or develop a grooming relationship with child victims and families—interactions that can easily be prevented by a sign on his door indicating "no candy or treats at this residence." To be sure, not every sexual offender will be found to be an SVP. But there is no way to know which will and which will not. More importantly, under *NetChoice*, Plaintiff Sanderson had the obligation to identify released SVPs as one of the targets of the Halloween statute, and show why that did not defeat his facial challenge. He did not.

The simple sign on a sex offenders door unambiguously keeps children and parents away from their quest to obtain candy or treats, and sexual predators away from potential future victims. Other provisions of the statute

21

are not enough—especially for an offender who may seek to skirt them. An offender who is seeking Halloween contact with victims could lurk at the door in the hope that a family will knock anyway. After all, as the Court heard in testimony from Sgt. Penny Cole, as she found from the children she adopted, in some neighborhoods children are told that the houses with their lights off "have the big candy bars." The sign makes clear to law enforcement and the community that the offender knows and is in compliance with the statute's requirements—and parents know the reason the lights are off is that there is no "candy or treats at this residence." All of these SVP offenders, before they re-offended so egregiously that juries and appellate courts found they should be civilly committed as sexually violent predators, were in the community, subject to the Halloween statute. By definition, we can never know which of the State's more than seventeen thousand offenders will one day become a sexually violent predator. It is a small cost to require all of them to post a sign one night a year that tells families they have no candy or treats at this residence.

Moreover, the Court admitted concerning evidence of recidivism of offenders confined for rape or sexual assault. Trial Exhibit KK, a report from the Department of Justice's Bureau of Justice Statistics found:

> Among persons released from state prisons in 2005 across 30 states after serving a sentence for rape or sexual assault, 8% were arrested for rape or sexual assault during the 9 years after their release. Overall, 67% of

sex offenders released in 2005 were arrested at least once for any type of crime during the 9-year follow-up period. About 3 in 10 (29%) sex offenders released in 2005 were arrested during their first year after release (figure 1). About 1 in 5 (20%) were arrested during their fifth year after release, and nearly 1 in 6 (16%) were arrested during their ninth year.

These statistics are extremely concerning, particularly when combined with Dr. Simpson's testimony and report, analyzing the grooming behaviors engaged in by sexual offenders and their applicability to Halloween night. Preventing a sexual offender from having access to a conveyor belt of children on Halloween night is an application of this law which the Court must give significant weight—whether or not it is possible to predict which offender will be in the subset of individuals who recidivate by committing crimes against children. The DOJ's report shows a statistically significant portion of offenders will commit a second sexual offense after having done so before.

Dr. Simpson also testified that even a lower risk of recidivism cannot predict with any level of certainty that an individual who has previously committed a sexual offense will not re-offend. Dr. Simpson provided as an example the case of Mr. James Philpot, a 73 year old Missouri bus driver and registered sex offender who was sentenced to 15 years in prison after pleading guilty to molesting 7-year-old student while driving a school bus in 2023.[8] Dr.

---

[8] Christine Byers, *Crawford County School District pays molestation victim $3.1M after hiring convicted sex offender as bus driver,* KSDK (Apr. 16, 2024, 4:49 P.M), https://www.ksdk.com/article/news/investigations/missouri-school-

Simpson testified that Mr. Philpot, an already registered older sexual offender at the time he was hired to drive a school bus, would have scored as a lower risk on psychosocial risk assessments that might have tried to predict his risk of recidivism.  And yet, when provided access to children as a bus driver, he molested a 7 year old who now has to be scarred for life because a sex offender was given access to groom and ultimately victimize her.  Missouri's Halloween statute seeks to prevent just such access and grooming.

The Court is well aware of and even noted on the record the significant impact sexual trauma has on a victim—particularly a child victim.  Although the Court did not allow her testimony on the merits, the Court did allow a proffer of the testimony of Ms. Brittany Cale, the victim of a sodomy committed by the Plaintiff when she was a teenager.

Applying the newly minted *NetChoice* analysis here, the Court should now accept on the merits the testimony of Ms. Cale as one example of the lifelong impact the sexual misconduct of Missouri's more than 17,000 sex offenders have had on their victims.  Ms. Cale testified that the Plaintiff's sexual sodomy of her impacts her to this day, more than 20 years later.  And she asked the court a poignant question: if we can put labels on things which can hurt us (like drugs) why can't we put a sign on a sex offender's door saying

district-pays-molestation-victim-3-1-million-hired-convicted-sex-offender-school-bus-driver/63-93ec0e38-e293-47ba-a91d-d50814c8710e.

24

"no candy or treats at this residence?"  The answer is: we can—and Missouri does.

The sign-posting mandate is a small but powerful way to separate offenders such as Thomas Sanderson, the bus driver and all of the SVPs described above from Missouri's children.  Neither this Court nor Missouri's legislature can predict which of Missouri's 17,367 active offenders will re-offend.  But as the report from the Bureau of Justice Statistics make clear, it is statistically likely that over the nine years after release, 8% will commit another sexual offense, and up to 67% will commit another criminal offense.  As it is impossible to know which offenders will re-offend, and the required sign makes clear to parents and children alike that there are "no candy or treats at this residence", keeping them off the doorsteps of these offenders, the Court must find that the balance tips inexorably towards the constitutionality of this statute.

Any decision that gives additional weight to the application of the law to Sanderson on the basis that he has brought the challenge without keeping in mind all of the other thousands of offenders across the state and how the sign posting mandate puts a barrier between them and potential victims recreates the failures of the vacated decisions in *NetChoice*.  This Court's analysis of the Plaintiff's facial challenge to the Halloween must consider *all applications* of the challenged statute–specifically, all 17,367 of them.  In doing so, the Court

25

must find that the constitutional applications of this statute far outweigh any possible "hard cases", preventing the worst offenders in society from grooming into their victims the most vulnerable in society: children.

**III.**  **Even under the previous "levels of scrutiny analysis", a lower level of scrutiny would have been appropriate, and the law also survives any level of scrutiny under older tests, as well as a history and tradition analysis.**

Second, turning to the traditional "levels of scrutiny" analysis, even before this term, Courts have found that the conduct speech analysis is particularly nuanced. *Compare, e.g.*, *Cohen v. California*, 403 U.S. 15, 18 (1971), *with United States v. O'Brien*, 391 U.S. 367, 376 (1968). There are many cases where a court has ruled that a statute regulated both conduct and speech; in many of these cases, the level of means-end scrutiny applied is lower than strict scrutiny. *See, e.g.*, *O'Brien*, 391 U.S. at 377. In such cases, courts have applied lesser levels of scrutiny, such as intermediate scrutiny or "more rigorous scrutiny", neither of which require a least restrictive means analysis. See, e.g., *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).

A key example of the content conduct dichotomy at work is *Rumsfeld v. FAIR.* 547 U.S. 47 (2006). In *Rumsfeld*, law faculty protested the Solomon Amendment, which required law schools to host the U.S. Military at career fairs. *Id.* at 52. They claimed the requirement allow career fairs and to post signs advertising those career fairs was compelled speech through association

26

and thus violated the First Amendment.[9] Further, since schools needed to release compelled statements of fact (e.g., "The U.S. Army recruiter will meet interested students in Room 123 at 11 a.m."), FAIR argued that the *Barnette* compelled speech doctrine applied.  *Id.* The Supreme Court disagreed, ruling that the compelled speech that the law schools pointed to was "plainly incidental to the Solomon Amendment's regulation of conduct."  *Id* at 62.  The fact that the school was forced to say something was simply a side effect of the regulation of conduct.

Just so here. The Halloween statute seeks to prevent sex offenders from making contact with children on a night where the norms surrounding children and property are abridged.  To prevent the conduct of sex offenders making contact with trick-or-treaters, the statute sets out preventative measures.  One such measure includes an incidental burden on speech. Just like the schools were required to notify students that military recruiters were present, sex offenders are required to notify passerby that "no candy or treats [are available] at this residence."[10] This is "simply not the same as forcing a student

---

[9] *Id.* at 61–62.

[10] While the signage requirement differs from the Solomon Amendment by specifying exactly what must be posted, the statutes are otherwise nearly identical in their requirements; both statutes require a baseline communication of information. The Solomon Amendment requires schools to list the information for meeting times. Failing to do so would violate the statute. The signage requirement simply specifies the minimum requirement. While this provides more guidance to the reader, it does not impose more

to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die.' It trivializes the freedom protected in *Barnette* and *Wooley* to suggest that it is." *Id.* at 63. Though the analysis in *Rumsfeld* applied a different test than the new *NetChoice* analysis, its holding remains at least a strongly persuasive example of the type of conduct that, as will be discussed next, the history and tradition of the First Amendment have long allowed to be required.

In any event, Sanderson has already conceded that the State has a compelling interest in protecting children. Doc 7-1 at 17. The Missouri Supreme Court has reached similar conclusions. *See, e.g., Kirk v. State*, 520 S.W.3d 443, 450 (Mo. 2017) (recognizing that protecting the public from crime is a compelling state interest). The State also has compelling Sovereign interests in maintaining our federalist system of government, and "the independent power of a State to articulate societal norms through criminal law. . . ." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998).

The Halloween statute's sign-posting mandate also allows for the facially neutral identification of sex offenders on Halloween night. The witness testimony revealed that most, but not all, people who post the "no treats or candy at this residence" sign are sex offenders. Law enforcement witnesses

---

speech requirements.

testified that the sign was an easy, visual way for law enforcement to identify those sex offenders and make sure they were complying with the other provisions of Missouri law. The United States District Court for the Middle District of Alabama has found that the ready identification of sex offenders by law enforcement is a compelling state interest. *McGuire v. Marshall*, 2024 WL 2401833, at *60–*61 (M.D. Al. May 23, 2024).[11] In Alabama, state law requires sex offenders to carry an ID card that indicates they are a sex offender. *Id*. at *60. This ID card does so with the code "CV606" *Id*. at *60. The district court found this provision of law survived under strict scrutiny analysis against a compelled speech claim. *Id*. at *60–*61. Although the code was compelled speech, it was facially neutral, it was "coded" and "in small black font." As a result, the compelled speech on the ID card was sufficiently narrowly tailored to achieve the state's compelling interest. *Id*. at *61. The Missouri sign-posting requirement survives for the same reasons: the message is coded and it need not be larger than "small black font." And, unlike the ID card requirement, which is year round, the sign-posting mandate applies only for a few hours each year.

And finally, the sign-posting requirement is part of Missouri's broader regulatory scheme governing the conduct of registered sex offenders. *See* Mo.

---

[11] An appeal by Alabama as to other portions of the order has been docketed, but not finalized.

Rev. Stat. § 589.400–§ 589.426; *see also* Mo. Rev. Stat. § 566.147 (governing how close certain sex offenders may live to schools, etc.). The state has summarized this regulatory scheme for every sex offender to read and certify compliance with, every time they register, on page four of the statewide sex offender registration form; all offenders sign and certify acknowledgement of on a regular basis[12] (Trial Exhibit CCC, page 4). That statutory regime includes a mechanism by which offenders are categorized by tier and then obligated to adhere to registration conditions. Mo. Rev. Stat. §§ 589.400; 589.404; 589.407; 589.414; 589.425. The law establishes a felony criminal offense for an offender's failure to register in accordance with statutory provisions and a misdemeanor criminal offense for an offender's failure to adhere to the specific provisions of Missouri Revised Statute § 589.426.1. This broader statutory scheme allows for sexual offenders to petition to be removed from the sexual offender registry and to therefore no longer be subject to, among other things, the Halloween-related restrictions contained in § 589.426.1. *See* Mo. Rev. Stat. § 589.426.2; *see also* Mo. Rev. Stat. § 589.401.17.

### *The history and tradition of the First Amendment allow for restrictions on sex offenders, including the sign posting mandate.*

The Supreme Court this term also broadened the reach of "history and

---

[12] Several witnesses for the state testified that the regularity of the registration by a sex offender varies depending on their tier, from quarterly for the highest tier to annually for the lowest.

tradition" in *Rahimi*.  *United States v. Rahimi*, 144 S. Ct. 1889 (2024).  In earlier briefing on this case, Defendants cited the Supreme Court's "history and tradition test" from *Bruen*, drawing analogies to the First Amendment context in this case with corollaries dating back to the early days of our republic in duties to warn such as in tort law.  *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022).  Following *Bruen*, the Eighth Circuit has repeatedly applied the history and tradition test when determining if a criminal law regulating possession of firearms is constitutional.[13]  This term, in *Rahimi*, the Supreme Court broadened the application of the history and tradition test in ways that are important to this Court's analysis

In his majority opinion, Justice Roberts clarified the test *Bruen* introduced determining the limits of the Second Amendment.  *Bruen* directed courts to consider the "historical tradition of firearm regulation" to determine if a restriction on firearm ownership violated the Second Amendment.[14]  Justice Roberts stated that under such a test, courts did not need to find a historical twin of a challenged law.[15]  Rather a challenged law could be upheld if "the new

---

[13] *United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024) (upholding a drug-user-in-possession statute based on historical analogues); *United States v. Dunn*, 76 F.4th 1062 (8th Cir. 2023) (upholding a felon-in-possession statute); *United States v. Cunningham*, 70 F.4th 502 (8th Cir. 2023) (upholding a felon-in-possession statute); *United States v. Jackson*, 69 F.4th 495, 501-06 (8th Cir. 2023) (upholding a felon-in-possession statute based on historical restrictions).
[14] *Id.* at 17.
[15] *Rahimi* 144 S. Ct. 1898.

law is relevantly similar to laws that our tradition is understood to permit applying faithfully the balance struck by the founding generation to modern circumstances."[16] Under this test a restriction on gun ownership by individuals subject to domestic violence restraining order was constitutional due to its similarity to historical surety and going armed laws that restricted individuals who posed a clear threat of physical violence through disarmament.[17] However, the court was not willing to accept an argument that the mere fact that someone has been shown to not be responsible or was shown to be dangerous,[18] meant that disarmament was allowed under the Second Amendment.[19]  In his concurrence, Justice Kavanagh explains the central role of history in interpreting the limit of constitutional rights. The interpretation of many constitutional rights, such as those referenced in the First Amendment,[20] have been understood to come with exception.[21] When faced with questions as to what those exceptions are, "history, not policy is the proper guide."[22] This reliance on history ensures that judges are following the Constitution not

---

[16] *Id.*

[17] *Id.* at 1901.

[18] There must be a more specific historical analogue for the Halloween statutes then merely the fact that Sanderson and other registered sex offenders have shown themselves to be dangerous.

[19] *Id.* at 1903.

[20] *Id.* at 1911 (Kavanagh, J., concurring)

[21] *Id.* ("[A]s a matter of original understanding and original meaning, that constitutional rights generally come with exceptions.").

[22] *Id.* at 1912.

"simply creating constitutional meaning out of whole cloth."[23]

As previously briefed (e.g. Doc 17 at 22-27) if this Court were to apply a history and tradition analysis to Missouri's Halloween statute, the statute would survive Sanderson's challenge. Sanderson cannot argue that the history and tradition of the framing era lacked a concept of a duty to warn, particularly when it comes to children. Traditionally, our nation has recognized duties to warn, particularly in cases of a person who is a licensee on a property—a situation akin to the license allowed to families to visit their neighbor's doorsteps on Halloween night.  And our nation has always recognized that children are unable to make decisions for themselves and often require additional supervision to avoid dangerous circumstances or potentially life-altering decisions (i.e., age limits on alcohol, tobacco, tattoos, etc.).  To that end, our tradition recognizes a greater duty of care when children are involved.

Moreover, the Missouri statute at issue—§ 589.426—establishes a criminal act and sets forth a criminal penalty as part of a comprehensive scheme designed to protect children from contact with sex offenders.[24] Although Sanderson only challenges the sign-posting requirement, the text

---

[23] *Id.*

[24] In addition to regulating other forms of Halloween related conduct Mo. Rev. Stat. § 589.426.1(1)-(4), the Halloween statute is part of the state's broader regulatory framework for regulation of sex offenders after release from prison, as summarized on page 4 of Trial Exhibit CCC.

and structure of Missouri's statute, as well as its context within the broader regulatory scheme restricting the conduct of sexual offenders on release into the community must be considered as a whole. *See, e.g., Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO*, 451U.S. 77, 97 (1981) ("The judiciary may not, in the face of such comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs.").

**IV.    This Court, if it determines relief is necessary, lacks the authority to craft a state-wide remedy under *Labrador*.**

Sanderson requests state-wide injunctive relief enjoining the Attorney General and Chief Hudanick from enforcing the sign-posting requirement of   Mo. Rev. Stat. § 589.426. As discussed above, Sanderson has failed to present any evidence from which this Court could find that the Attorney General has any role in enforcing the sign-posting requirement of Mo. Rev. Stat. § 589.426. This Court did not hear any evidence that the Attorney General supervises any law enforcement officer, whether that be a member of the Missouri State Highway Patrol, a county sheriff's office, or a local police force. Similarly, Sanderson failed to present any evidence that would allow this Court to find that Chief Hudanick has, or has ever had, any role in enforcing Mo. Rev. Stat. § 589.426 in any jurisdiction but Hazelwood, Missouri.

Throughout pre-trial proceedings, during temporary restraining order

litigation, and throughout the hearing in this matter, the Attorney General has repeatedly asserted that this Court is without the jurisdiction or legal authority to issue state-wide relief for every sex-offender in Missouri. This, the Attorney General has argued, is, at least in part, because Sanderson's challenge is a facial challenge to a state criminal statute. As the Attorney General has explained above, *NetChoice* requires Sanderson to make an extremely difficult showing to make such a challenge, a showing which Sanderson has completely failed to make.

And the United States Court of Appeals for the Eighth Circuit, has recognized the same. "'Facial challenges are disfavored' because they 'often rest on speculation. . . . [and] raise the risk of "premature interpretation of statutes on the basis of factually barebones records."'" *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 687 (8th Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Here, Sanderson's challenge fairs even worse than other facial challenges because Sanderson has been given the opportunity to create the required record during a hearing in this Court and has failed on all fronts.

Further, during the pendency of this action, the Supreme Court decided *Labrador v. Poe*, 144 S. Ct. 921 (2024). In *Labrador*, the Court granted a stay of state-wide injunctive relief, except as to the plaintiffs who had brought the case below. 144 S. Ct. at 921. In his concurrence, Justice Gorsuch explained,

35

"This Court has long held that a federal court's authority to fashion equitable relief is ordinarily constrained by the rules of equity known " 'at the time of the separation of ' " this country from Great Britain." *Id.* (citations omitted). "Under those rules, this Court has said, a federal court may not issue an equitable remedy "more burdensome to the defendant than necessary to [redress]" the plaintiff's injuries." And at least one judge on the Eighth Circuit has previously expressed a similar understanding of universal injunctions. *Rodgers v. Bryant*, 942 F.3d 451, 460–68 (8th Cir. 2019) (Stras, J, concurring in part). Here, Sanderson asks for drastic equitable relief—a state-wide injunction enjoining the enforcement of Mo. Rev. Stat. § 589.426 against any individual in every circumstance. That equitable remedy is far more burdensome to Missouri than necessary to redress the plaintiff's injuries because Sanderson has shown no injury, let alone one that should be redressed by a state-wide injunction preventing any application of Mo. Rev. Stat. § 589.426 regardless of any distinct factual circumstance.[25]

At bottom, while the Attorney General continues to assert that

---

[25] As to not be misunderstood, Missouri is not taking the position that universal injunctions are always improper. Congress may give this Court jurisdiction and authority to grant universal injunctions and it has in other contexts like the Administrative Procedure Act. Put another way, a statute may give this Court greater authority to grant relief beyond the parties; but where a litigant, like Sanderson here, has not established a statutory remedy broader than general equitable authority, that litigant is limited by the constraints outlined in *Labrador*.

Sanderson is entitled to no relief, even if this Court determines otherwise, it should not grant a state-wide injunction. As Justice Gorsuch stated in his *Labrador* concurrence:

> Lower courts would be wise to take heed. Retiring the universal injunction may not be the answer to everything that ails us. But it will lead federal courts to become a little truer to the historic limits of their office; promote more carefully reasoned judicial decisions attuned to the facts, parties, and claims at hand; allow for the gradual accretion of thoughtful precedent at the circuit level; and reduce the pressure on governments to seek interlocutory relief in this Court. A return to a more piecemeal and deliberative judicial process may strike some as inefficient. It may promise less power for the judge and less drama and excitement for the parties and public. But if any of that makes today's decision wrong, it makes it wrong in the best possible ways, for "good judicial decisions are usually tempered by older virtues." *DHS*, 589 U. S., at ——, 140 S. Ct., at 600.

## CONCLUSION AND PRAYER FOR RELIEF

The Court should dismiss Plaintiff's petition as the Plaintiff (I) lacks standing to challenge a law which (II) should be analyzed under intermediate scrutiny but survives any level of scrutiny, under the fair sweep of the *Salerno* standard applying our high court's recent *NetChoice* holding; moreover, (III) history and tradition support the Constitutionality of the sign posting mandate in the First Amendment context, and in any event (IV), the Court must limit any relief deemed appropriate only to the Plaintiff (*Poe v. Labrador*).

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

/s/ *Gregory M. Goodwin*
Gregory M. Goodwin
Assistant Attorney General
Missouri Bar #65929
P.O. Box 899
Jefferson City, MO 65102
(573) 751-7017
(573) 751-2096 Fax
gregory.goodwin@ago.mo.gov

/s/ *Peter F. Donohue Sr.*
Peter F. Donohue Sr.
Assistant Attorney General
Missouri Bar #75835
815 Olive Street, Suite 200
St. Louis, MO 63101
(314) 340-7838
(573) 751-0774 Fax
peter.donohue@ago.mo.gov

/s/ *Andrew J. Clarke*
Andrew J. Clarke
Assistant Attorney General
Missouri Bar #71264
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1546
(573) 751-2096 Fax
andrew.clarke@ago.mo.gov
Attorneys for Attorney General Bailey

38

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, and any attachment, was electronically filed using the CM/ECF system on Monday, July 22, 2024. All counsel of record will receive service by operation of the CM/ECF system.

*/s/ Gregory M. Goodwin*
GREGORY M. GOODWIN
Assistant Attorney General

39